LEE LITIGATION GROUP, PLLC
C.K. Lee (CL 4086)
Anne Seelig (AS 3976)
148 West 24th Street, Eighth Floor
New York, NY 10011
Tel.: (212) 465-1188
Fax: (212) 465-1181
*Attorneys for Plaintiff, the FLSA Collective Plaintiffs,*
*and the Class*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARCUS ANTHONY RHEA, *on behalf of himself, the FLSA Collective Plaintiffs, and the Class,* | Case No.: |
| Plaintiff, | |
| v. | **CLASS AND COLLECTIVE ACTION COMPLAINT** |
| CLIPPER REALTY, INC., d/b/a CLIPPER REALTY, CLIPPER REALTY OP L.P., d/b/a CLIPPER REALTY L.P. CLIPPER REALTY CONSTRUCTION LLC, CLIPPER 107 CH LLC, d/b/a CLOVER HOUSE, CLIPPER EQUITY LLC, d/b/a CLIPPER EQUITY, | **Jury Trial Demanded** |
| Defendants. | |

Plaintiff MARCUS ANTHONY RHEA ("Plaintiff" or "RHEA"), on behalf of himself and others similarly situated, by and through his undersigned attorneys, hereby files this Class and Collective Action Complaint against Defendants, CLIPPER REALTY INC. d/b/a CLIPPER REALTY ("Clipper Realty"), CLIPPER REALTY OP L.P., CLIPPER REALTY CONSTRUCTION LLC, CLIPPER 107 CH LLC d/b/a CLOVER HOUSE (collectively the "Clipper Realty Defendants"), and CLIPPER EQUITY LLC d/b/a CLIPPER EQUITY ("Clipper

1

Equity") (Clipper Equity together with the Clipper Realty Defendants, collectively, the "Defendants"), and states as follows:

## INTRODUCTION

1.      Plaintiff alleges, pursuant to the Fair Labor Standards Act, as amended, 29 U.S.C. §§ 201 *et seq.* ("FLSA"), that he and others similarly situated are entitled to recover from Defendants: (1) unpaid wages, including overtime wages, due to improper deductions from their supposed salary, (2) liquidated damages, and (3) attorneys' fees and costs.

2.      Plaintiff further alleges, pursuant to the New York Labor Law ("NYLL"), that he and others similarly situated are entitled to recover from Defendants: (1) unpaid wages, including overtime wages, due to improper deductions from his supposed salary, (2) statutory penalties, (3) liquidated damages, and (4) attorneys' fees and costs.

3.      Additionally, Plaintiff alleges on an individual basis that, he is entitled to recover the Paid Time Off (PTO) earned over the course of his employment but which were improperly applied by Defendants against his salary even though Plaintiff worked during said leaves. Such leaves are actually unused leaves which Defendants are required to compensate at the time of an employee's separation pursuant to the terms of their employment and pursuant to NYLL §§ 190(1) and 196-B. Defendants violated the NYLL and breached their contract with Plaintiff who left Defendants' employment.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this controversy pursuant to 29 U.S.C. § 216(b), 28 U.S.C. §§ 1331, 1337 and 1343, and has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367.

5.      Venue is proper in the Southern District pursuant to 28 U.S.C. § 1391 as all Defendants are entities subject to New York's personal jurisdiction.

## PARTIES

6.      Plaintiff, MARCUS ANTHONY RHEA, is a resident of Essex County, New Jersey.

7.      Defendants are real-estate companies, which buy, sell, develop, and provide property management for residential and commercial properties in the New York area.

8.      Defendant Clipper Realty owns, as a parent company, all Defendants except for Clipper Equity.

9.      While Clipper Equity is not a subsidiary of Clipper Realty, Clipper Equity and all the Clipper Realty Defendants operate as a single common enterprise and as joint employers for the employees at their jointly managed buildings. Both Clipper Equity and Clipper Realty share (1) common ownership, management, and executive officers in David Bistricer, J.J. Bistricer, Sam Levinson, Jacob Schwimmer, and their family members (2) engage in interrelated operations, and (3) share centralized management.

10.     Clipper Equity and the Clipper Realty Defendants own different buildings throughout New York.  Although Defendants own different buildings in New York, Defendants' actions, public statements, and corporate documents, as detailed in the below paragraphs and their subparts, Defendants jointly manage the employees located at their owned and/or operated buildings.

11.     The Clipper Realty Defendants, own and operate the following buildings in New York:

       a.  1955 First Avenue in Manhattan, New York, NY 10029, which is 8 stories containing 232 units (the "Aspen Property").

    b.  10 West 65th Street, New York, NY 10023, which contains 82 residential units.

    c.  1010 Pacific Street, Brooklyn, NY 11238, a potential 175-unit residential building currently being redeveloped.

    d.  50 Murray Street, New York, NY 10007 53 Park Place, New York, NY 10007 two neighboring buildings in the Tribeca, one which is 21 stories and the second which is 12 stories, containing both residential and retail-space (the "Tribeca Houses").

    e.  1403 New York Ave, Brooklyn, NY 11210, which is a 59-building residential housing complex containing 2,493 rentable units (the "Flatbush Gardens").

    f.  141 Livingston Street in Brooklyn, Brooklyn, NY 11201, which is a 15-story office building.

    g.  107 Columbia Heights, Brooklyn, NY 11201, 11-story residential building containing approximately 160 units (the "Clover House").

12.    Defendant Clipper Equity owns and operates buildings in New York with thousands of residential units, including the building located at 125 Parkside Avenue, Brooklyn, NY 11226.

13.    The Clipper Realty Defendants and Defendant Clipper Equity are engaged in a single common enterprise and operate as joint employers for their collective employees:

    a.  All the Defendants share a common ownership and executive officers in David Bistricer, J.J. Bistricer, Sam Levinson, and Jacob Schwimmer. *See* **Exhibit A,** Clipper Realty 2021 Proxy Statement.

    b.  Defendant Clipper Realty's special voting stock is wholly owned by David Bistricer, Sam Levinson, Jacob Schwimmer, and their families. *See* **Exhibit A**. Further, the same individuals collectively owned near seventy percent (70%) majority stake of all outstanding shares for Defendant Clipper Realty Inc. *See* **Exhibit A.**

    c.  Defendant Clipper Equity is a privately held corporation wholly owned by David Bistricer, J.J. Bistricer, Sam Levinson, Jacob Schwimmer, and their immediate family members. *See* **Exhibit A.**

    d.  The Clipper Realty Defendants and Defendant Clipper Equity engage in joint ventures.  *See* **Exhibit A**.

    e.  The Clipper Realty Defendants and Defendant Clipper Equity share executive support services, financial controller, and payroll service among their corporations.  Defendant Clipper Realty through its subsidiary entered into a broad mutual service agreement with Clipper Equity, within which both parties agree to share, "support services[,]" including "construction and information

technology services[,]" "finance services (including operations controller, payroll, billing and bank…), and "executive support services." *See* **Exhibit B**, Mutual Service Agreements.

f. The Clipper Realty Defendants and Defendant Clipper Equity jointly manage buildings where Plaintiff worked. *See* **Exhibit C,** Financial Statement on ACRIS showing Ownership of Clover House as Clipper Realty subsidiary; *see also* **Exhibit D**, Street Easy Listing of Clipper Realty property Clover House by Clipper Equity; **Exhibit E**, Advertising for Rent of Clover House by Clipper Equity.

g. Defendants maintained a central office at 4611 12th Avenue, Suite 1L, Brooklyn, for executive management and key managerial and support staff. *See* **Exhibit F,** Listing Headquarter Address for Clipper Equity; *see also* **Exhibit G**, Listing same Headquarter Address for Clipper Realty.

h. Defendants operate the locations listed on their shared websites jointly.

i. Employees were used interchangeably by the Defendants. Plaintiff worked as a Mechanical Operations Manager in charge of heating ventilation for all of Defendant's buildings.

j. All paychecks of Defendants' employees are issued through a centralized shared payroll department. *See* **Exhibit B**, Mutual Service Agreements.

k. Defendant Clipper Equity's website at https://www.clipperequity.com/ displays the logos for both Clipper Equity and Clipper Realty and are continuously fixed at all times at the top of the webpage with each logo acting as a clickable link bringing users directly to either company's main homepage. *See* **Exhibit F.**

l. Employees employed by Defendants were subject to the same wage policies, on-boarding documents, employee policies, human resources policies and workplace rules and guidelines.

14.    In addition to being a single integrated enterprise, Clipper Realty and Clipper Equity directly controlled the employees of the other. Clipper Realty and Clipper Equity shared employer functions and operated as joint employers as to all employees. While employees may nominally be employed by either company (or their subsidiaries), non-exempt employees would be managed by staff members of both Clipper Realty and Clipper Equity.

15.    Further that Defendants operated as a joint employer is evidenced by the frequent change of information in the paystubs of employees without warning or notice, including the change in nominal Corporate Defendant under which Corporate Defendants' employees were

5

employed, to suit Defendants' needs. Such supposed changes to employees' nominal employer were irrelevant to their employment. The change in employees' nominal employer did not result in a change of employees' direct manager, rate of pay, frequency of pay, payroll department, human resources department, employment policies, employment duties, employee handbook, schedule, or hours. As detailed above, employees' employment, reports, human resources department, and payroll department were all directly controlled by parent companies Clipper Realty and Clipper Equity; therefore, the nominal employer of Defendants' employees could be, and in fact was, substituted between Defendants and their subsidiaries without any change to the terms and conditions of employees' employment or any actual change regarding who exercised control of the employees.

16.     Corporate Defendant, CLIPPER REALTY INC. d/b/a CLIPPER REALTY, is a foreign business corporation duly organized under the laws of the state of Maryland with its principal place of business and address for service of process located at 4611 12th Avenue, Suite 1L, Brooklyn, New York 11219.

17.     Corporate Defendant, CLIPPER REALTY OP L.P., is a foreign limited Partnership duly organized under the laws of the State of Delaware with its principal place of business and address for service of process located at 4611 12th Avenue, Suite 1L, Brooklyn, NY 11219.

18.     Corporate Defendant, CLIPPER REALTY CONSTRUCTION LLC, is a foreign limited liability company duly organized under the laws of the state of Delaware with its principal place of business and address for service of process located at 4611 12th Avenue, Suite 1L, Brooklyn, New York 11219.

19.     Corporate Defendant CLIPPER 107 CH LLC d/b/a CLOVER HOUSE is a limited liability company duly organized under the laws of the State of Delaware with its address for service of process located at 4611 12th Avenue, Suite 1L, Brooklyn, NY 11219.

20.     Corporate Defendant, CLIPPER EQUITY LLC d/b/a CLIPPER EQUITY, is a domestic limited liability company organized under the laws of the State of New York with its principal place of business located at 4611 12th Avenue, Suite 1L, Brooklyn, NY 11219, and an address for service of process located at PO Box 190-407, Brooklyn, NY 11219.

21.     This Court has personal jurisdiction over the Defendants in that they are incorporated in the state of New York or operate their headquarters from the State of New York.

22.     Each Defendant engages in an enterprise whose annual volume of sales made or business done is not less than $500,000, the activities of which affect interstate commerce in that the employees of each Defendant handles goods and materials produced outside of New York (including vehicles, tools, cleaning supplies, and other items) that have moved in interstate commerce, and the Defendants are thus employers subject to the jurisdiction of the FLSA.

23.     At all relevant times, each of the Corporate Defendants was and continues to be an "enterprise engaged in commerce" within the meaning of the FLSA and the NYLL and any Regulations thereunder.

24.     At all relevant times, the work performed by Plaintiff, FLSA Collective Plaintiffs and Class Members was directly essential to the business operated by Defendants.

25.     Plaintiff has fulfilled all conditions precedent to the institution of this action and/or such conditions have been waived.

## FLSA COLLECTIVE ACTION ALLEGATIONS

26.     Plaintiff brings claims for relief as a collective action pursuant to FLSA Section l6(b), 29 U.S.C. § 216(b), on behalf of all exempt employees, (including but not limited to building managers, assistant managers, HVAC managers, department managers and supervisors, etc.) employed by Defendants on or after the date that is six (6) years before the filing of the Complaint in this case as defined herein ("FLSA Collective Plaintiffs").

27.     At all relevant times, Plaintiff and FLSA Collective Plaintiffs are and have been similarly situated, have had substantially similar job requirements and pay provisions, and are and have been subjected to Defendants' decisions, policies, plans, programs, practices, procedures, protocols, routines, and rules, all culminating in a willful failure and refusal to pay them regular and overtime wages for all hours worked due to improper deductions from their supposed salaries. The claims of Plaintiff stated herein are essentially the same as those of FLSA Collective Plaintiffs.

28.     The claims for relief are properly brought under and maintained as an opt-in collective action pursuant to Section 16(b) of the FLSA, 29 U.S.C. § 216(b). The FLSA Collective Plaintiffs are readily ascertainable. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Defendants. Notice can be provided to the FLSA Collective Plaintiffs via first class mail to the last address known to Defendants.

## RULE 23 CLASS ALLEGATIONS

29.     Plaintiff brings claims for relief pursuant to the Federal Rules of Civil Procedure ("F.R.C.P.") Rule 23, on behalf of all exempt employees, (including but not limited to building managers, assistant managers, HVAC managers, department managers and supervisors, etc.) employed by Defendants on or after the date that is six (6) years before the filing of this Complaint (the "Class" or "Class Members").

30.     At all relevant times, Plaintiff and Class Members are and have been similarly situated, have had substantially similar job requirements and pay provisions, and are and have been subjected to Defendants' decisions, policies, plans, programs, practices, procedures, protocols, routines, and rules, all culminating in a willful failure and refusal to pay them regular and overtime wages for all hours worked due to improper deductions from their supposed salaries. The claims of Plaintiff stated herein are essentially the same as those of Class Members.

31.     Class Members are readily ascertainable. The number and identity of the Class Members are determinable from the records of Defendants. The hours assigned and worked, the position held, and rates of pay for each Class Member are also determinable from Defendants' records. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Defendants. Notice can be provided by means permissible under F.R.C.P. 23.

32.     The proposed Class is so numerous that a joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the Court. Although the precise number of such persons is unknown, the facts on which the calculation of that number are presently within the sole control of Defendants, there is no doubt that there are more than forty (40) members of the Class.

33.     Plaintiff's claims are typical of those claims that could be alleged by any member of the Class, and the relief sought is typical of the relief that would be sought by each member of the Class in separate actions. All Class Members were subject to Defendants' corporate practices of (i) failing to pay wages including overtime wages for all hours worked due to improper deductions from their supposed salaries, (ii) failing to provide Class Members with proper wage

statements with every payment of wages, and (iii) failing to properly provide wage notices to Class

Members, at date of hiring and dates of all wage changes, per requirements of the NYLL.

34.     Defendants' corporate-wide policies and practices affected all Class Members

similarly, and Defendants benefited from the same type of unfair and/or wrongful acts as to each

Class Member. Plaintiff and other Class Members sustained similar losses, injuries and damages

arising from the same unlawful policies, practices and procedures.

35.     Plaintiff is able to fairly and adequately protect the interests of the Class and has no

interests antagonistic to the Class. Plaintiff is represented by attorneys who are experienced and

competent in both class action litigation and employment litigation and have previously

represented plaintiffs in wage and hour cases.

36.     A class action is superior to other available methods for the fair and efficient

adjudication of the controversy – particularly in the context of the wage and hour litigation where

individual class members lack the financial resources to vigorously prosecute a lawsuit against a

corporate defendant. Class action treatment will permit a large number of similarly situated

persons to prosecute common claims in a single forum simultaneously, efficiently, and without the

unnecessary duplication of efforts and expense that numerous individual actions engender.

Because losses, injuries and damages suffered by each of the individual Class Members are small

in the sense pertinent to a class action analysis, the expenses and burden of individual litigation

would make it extremely difficult or impossible for the individual Class Members to redress the

wrongs done to them. On the other hand, important public interests will be served by addressing

the matter as a class action. The adjudication of individual litigation claims would result in a great

expenditure of Court and public resources; however, treating the claims as a class action would

result in a significant saving of these costs. The prosecution of separate actions by individual

members of the Class would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the Class, establishing incompatible standards of conduct for Defendants and resulting in the impairment of Class Members' rights and the disposition of their interests through actions to which they were not parties. The issues in this action can be decided by means of common, class-wide proof. In addition, if appropriate, the Court can, and is empowered to, fashion methods to efficiently manage this action as a class action.

37.     Defendants and other employers throughout the country violate their respective states' labor laws. Current employees are often afraid to assert their rights out of fear of direct or indirect retaliation. Former employees are fearful of bringing claims because doing so can harm their employment, future employment, and future efforts to secure employment. Class actions provide Class Members who are not named in the Complaint a degree of anonymity, which allows for the vindication of their rights while eliminating or reducing these risks.

38.     There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members, including:

a) Whether Defendants employed Plaintiff and Class Members within the meaning of the NYLL;

b) What are and were the policies, practices, programs, procedures, protocols and plans of Defendants regarding the types of work and labor for which Defendants did not pay Plaintiff and Class Members properly;

c) At what common rate, or rates subject to common methods of calculation, were and are Defendants required to pay Plaintiff and Class Members for their work;

d) Whether Defendants properly notified Plaintiff and Class Members of their regular hourly rate and overtime rate;

e) Whether Defendants paid Plaintiff and Class Members for all hours worked given Defendants' practice of improperly deducting hours from their supposed salaries;

f) Whether Defendants provided proper wage statements to Plaintiff and Class Members per requirements of the NYLL; and

g) Whether Defendants provided proper wage notices to Plaintiff and Class Members per requirements of the NYLL.

## STATEMENT OF FACTS

39.     In or about February 2019, Plaintiff was hired by Defendants to work as a Mechanical Operations Manager for all of Defendants' buildings as enumerated above. Plaintiff's employment was terminated in or around April 20, 2023, as (according to Defendants) his position was eliminated.

40.     Throughout his employment, Plaintiff was scheduled to work from 9:00 a.m. to 6:00 p.m., Mondays through Fridays, for a total of forty-five (45) hours per week. Despite his scheduled end time, Plaintiff regularly worked beyond 6:00 p.m. for approximately one (1) to three (3) hours which raised his weekly hours to fifty (50) to sixty (60) hours a week. Aside from working on the weekdays, Plaintiff was occasionally required to work on Saturdays, from 9:00 a.m. to 6:00 p.m., about once every other month. Plaintiff was also required to work through his lunch break.

41.     Throughout his employment, Plaintiff was paid at a fixed rate of $ 5,290.00, without overtime, every two weeks regardless of how many hours he worked. Similarly, FLSA Collective Plaintiffs and Class Members were also paid at a fixed rate, without overtime.

42.     Throughout his employment, Plaintiff was not required to clock in or clock out as he was paid a fixed rate regardless of the hours he worked. However, Defendants frequently and improperly deducted wages from Plaintiff's fixed salary for the days that Plaintiff or Defendants' clock in machine did not clock in or clock out. This occurred even if Plaintiff worked on such days. Similarly, FLSA Collective Plaintiffs and Class Members were improperly deducted wages for the days that they worked.

43.     Additionally, on some days that Defendants improperly deducted wages from Plaintiff's salary, Defendants also improperly paid Plaintiff as having used his PTOs (including paid sick and vacation leaves), even if Plaintiff actually worked on such days. Therefore, Plaintiff's accrued and unused PTOs were improperly reduced. Similarly, FLSA Collective Plaintiffs and Class Members were improperly deducted wages and PTOs for days that they actually worked.

44.     Defendants had knowledge that Plaintiff, FLSA Collective Plaintiffs and Class Members worked on those days as they would correspond regarding the work they conducted in person or via text messages, calls, or emails. Nevertheless, Defendants still made such improper deductions.

45.     Defendants treated Plaintiff as an exempt employee as he was hired as a Mechanical Operations Manager in charge of overseeing the heating ventilation for all of Defendant's buildings. However, because Defendants made improper deductions from Plaintiff's supposed salary, Defendants were not permitted to use the exemption pursuant to FLSA, 29 U.S.C. § 541.603. Despite the exempt status being invalid, Plaintiff was never paid any overtime premiums for the hours he worked over forty (40) in each workweek. Moreover, there was never any agreement that Plaintiff's supposed salary was intended to cover Plaintiff's overtime hours. Similarly, FLSA Collective Plaintiffs and Class Members are owed overtime premiums as they lost their exempt status due to Defendants' improper deductions.

46.     Plaintiff complained about his underpayments to the Human Resources Department as he was frequently being paid at a lower amount than what he should have been receiving despite working full hours. However, Human Resources Department refused to address the issue. Therefore, Plaintiff continued to lose his PTOs and receive lower compensation than what he was supposed to receive.

47.     Plaintiff and Class Members never received a wage notice from Defendants. They also did not receive accurate wage statements from Defendants.

48.     In violation of the Wage Theft Protection Act ("WTPA")—incorporated into NYLL—Defendants knowingly and willfully operated their business with a policy of not providing wage notices to Plaintiff and Class Members at the beginning of their employment with Defendants.

49.     Defendants further violated the WTPA by failing to provide Plaintiff and Class Members with accurate wage statements, because wage statements that do not reflect the actual number of hours worked by the employee, the proper rates, and the proper deductions, do not satisfy the requirements of the WTPA. *See Brito v. Lucky Seven Rest. & Bar, LLC*, 2021 U.S. Dist. LEXIS 55822, at *36 (S.D.N.Y. Mar. 24, 2021) ("Courts in this District have held that the WTPA's purpose, based on its text and history, is to ensure that the employer provides the employee with accurate information."); *Shi Yong Li v. 6688 Corp.*, 2013 U.S. Dist. LEXIS 148020, *6 (S.D.N.Y. Sept. 27, 2013) ("The wage statements provided failed to accurately indicate the amount of time *actually* worked by tipped employees") (emphasis added); *Copper v. Cavalry Staffing, LLC*, 132 F. Supp. 3d 460, 468 (E.D.N.Y. 2015) (holding that "the 'number of overtime hours' that appears on the wage statement should include every hour *actually* 'worked' by the employee") (emphasis added); *Campos v. Bkuk 3 Corp.*, 2021 U.S. Dist. LEXIS 151528, *30 (S.D.N.Y. Aug. 10, 2021) ("Thus, when paystubs were received, they were not accurate insofar as they did not accurately reflect the hours *actually* worked") (emphasis added).

50.     In failing to provide proper wage statements and notices, Defendants have failed to comply with the law in a manner that entails a concrete harm to an interest identified by the New York State legislature. As one Court observed:

14

Here, Plaintiffs allege that Defendants failed to furnish them with proper wage notices and statements, as required by NYLL §§ 195(1) and 195(3). These provisions were enacted as part of New York's Wage Theft Prevention Act ("WTPA"), N.Y. Lab. Law § 195, which sought "to expand the rights of employees to seek civil and criminal avenues of remedy for their employers failing to follow labor law appropriately and the specifications therein." N.Y. Spons. Mem., 2010 S.B. 8380. More specifically, the New York State Assembly passed the WTPA to address studies showing that a large number of employees were not being paid the wages owed to them, and that many employers were not adequately informing their employees of their wages and how they are calculated in language the employees could understand. *Id.* The New York State Assembly opined that existing penalties did not adequately deter employers from paying less than the wages owed, and stated that the WTPA would dramatically change this by increasing penalties for violating employees' rights. *Id.*

*Imbarrato v. Banta Mgmt. Servs.*, 2020 U.S. Dist. LEXIS 49740, *21-22 (S.D.N.Y. March 20, 2020)

51.     Here, Defendants' failure goes beyond generating a risk of harm to Plaintiff and Class Members. Defendants' conduct actually harmed Plaintiff and Class Members. Defendants' failure to provide wage notices and paystubs listing all hours actually worked, rates of pay, including overtime hours and overtime rates, deprived employees of the ability to contest the pay provided by Defendants, allowed Defendants to hide their wrong-doing, and necessitated the current litigation to vindicate Plaintiff's rights. This conduct ensured Defendants' ability to further delay providing proper compensation to low wage earners entitled to protection under federal and state law. Defendants' failure to provide wage notices and wage statements to employees allowed Defendants to hide their responsibility and deprive employees of timely compensation.

52.     Had the wage statements Defendants provided to Plaintiff  and Class Members accurately listed the total number of hours actually worked, and the proper rates of pay, as required by law, Defendants would have had to either (a) increase the wages to correspond to the hours actually worked or (b) forthrightly acknowledge, by way of the wage statement, that the employee's wages did *not* correspond to the hours the employee actually worked. Either possibility

would have allowed Plaintiff and Class Members to vindicate their rights under the NYLL. The deprivation of these possibilities therefore constitutes an injury.

53.     The failure to provide proper wage notices and wage statements continues to result in delayed payment of all proper wages owed to Plaintiff and Class Members. This delayed payment caused Plaintiff and Class Members to struggle to pay bills and other debts.

54.     Defendants knowingly and willfully operated their business with a policy of not providing proper wage notices and wage statements as required by NYLL.

55.     The direct effect of understating the number of hours an employee worked is to reduce the wages that employees are listed as having earned on their wage statements. The direct effect of this, in turn, is to reduce the employee earnings that the employer later reports to the IRS through the employee's W-2 form, as such information is derived from the information on employees' wage statements. See *Mills v. Mills*, 2021 Minn. Dist. LEXIS 200, *5 (Minn. Dist. Ct., Anoka County, Tenth Judicial District May 20, 2021) ("Petitioner's gross annual income, based on her 2020 W-21 and paystub dated 12/24/20, is $130,321.30"); T.F. v. N.F., 820 N.Y.S.2d 846, 846 (Sup. Ct., Suffolk Cty., June 22, 2006) ("In 2005 the plaintiff earned $ 133,086 as reflected on his final year paystub and W-2").[1]

56.     The effect of reporting reduced wages on an employees' W-2 is, in turn, to reduce the amount of social security benefits available to the employee, as an employee's entitlement to

---

[1] It is true that the wages reported on W-2 forms are not always precisely identical to those listed on an employees' last paystub for the year. One reason for is, as the IRS explains, that "W-2 wages include: (i) the total amount of wages as defined in section 3401(a); (ii) the total amount of elective deferrals (within the meaning of section 402(g)(3)); (iii) the compensation deferred under section 457; and (iv) the amount of designated Roth contributions (as defined in section 402A)." https://www.irs.gov/pub/irs-drop/rp-19-11.pdf. However, the possibility, that wages listed on a W-2 might be affected by such considerations does not change the fact that the base wages on the W-2 are derived from paysubs. The paystub processing service *realcheckstubs* explains: "A pay stub contains crucial information that assists in calculating W2 wages. Paystub provides gross wages, deductions, taxes withheld, and other income-related data. Individuals gather the necessary figures required for accurate W2 calculation by referring to the pay stub." https://www.realchecksubs.com/blog/paystubs/6-steps-how-to-calculate-w-2-wages-from-paystub.

benefits reflects how much money he or she is reported as having contributed to the social security system. *See McGauran v. Soc. Sec. Comm'n*, 2001 U.S. Dist. LEXIS 3187, *7 (N.D. Cal. March 19, 2001) ("Social security benefits are based upon the worker's earnings as reported to the [SSA] . . . [and] the worker's earnings are used to determine insured status for entitlement to retirement and to calculate cash benefit rates." (quoting Social Security Administration, Handbook § 1400 (1997)); *Coward v. Zurich Am. Ins. Co*., 2011 U.S. Dist. LEXIS 74543, *3 (N.D. Ill. July 8, 2011) ("Under the Social Security statute, entitlement depends on 'the total of the wages paid . . . to an individual in a calendar year.'") (quoting 42 U.S.C. § 413(a)(2)(A)(ii)).

57.     "In the wake of the Supreme Court's decision in *TransUnion*, courts in this Circuit have held that plaintiffs lack standing to bring wage notice and statement claims under the NYLL absent any concrete, downstream consequences of the recordkeeping violation." *Chen v. Lilis 200 W. 57th Corp.*, No, 2023 U.S. Dist. LEXIS 38163, at 18, 2023 WL 2388728, at *8 (S.D.N.Y. Mar. 7, 2023). "On the other hand, 'allegations' that go 'beyond asserting a bare statutory violation and sufficiently allege concrete harm' resulting from 'the underpayment of wages' pass muster because 'monetary injury is a concrete harm sufficient for purposes of Article III standing.'" *Thompson v. Elev8 Ctr. N.Y.*, LLC, 2023 U.S. Dist. LEXIS 122504, *21 (S.D.N.Y. July 17, 2023) (quoting *Mateer v. Peloton Interactive, Inc.*, 2022 U.S. Dist. LEXIS 125017, at *4 2022 WL 2751871, at *2 (S.D.N.Y. July 14, 2022)).

58.     Here, it is clear that Defendants' failure to provide Plaintiff and Class Members with accurate wage statements entailed "concrete, downstream consequences" involving monetary injury. Had the number of hours, rates of pay, and deductions been accurately reported for a given pay period, Defendant's automatic payroll system would have correspondingly increased the wages due for that period, which in turn would have been reflected in the W-2s that Defendants

submitted to the IRS on behalf of Plaintiff and Class Members. That, in turn, would have increased Plaintiff's and Class Members' entitlement to social security benefits. Because the inaccuracy prevented this outcome, it constitutes an injury sufficient to provide Plaintiff with Article III standing.

59.     Courts agree that the misreporting of wages constitutes a concrete injury cognizable under Article III:

> The Seventh Circuit in *Calderon* squarely addressed FICA standing. The plaintiffs in *Calderon* were former employees alleging the employer failed to pay their FICA taxes. 999 F.2d at 1105-06. The Seventh Circuit found that the plaintiffs lacked standing to compel the employer to pay their FICA taxes because "[b]enefits do not. . . depend on whether the employer actually paid the taxes." *Id.* at 1106. Plaintiffs could, however, enforce FICA's reporting requirement because it is the reporting of income that triggers benefits, and losing benefits is an injury under *Lujan*. *Id.* Whether the employer in *Calderon* made FICA payments on the plaintiffs' behalf had no bearing on the plaintiffs' entitlement to benefits. *Id.* "[T]he plaintiff's real interest lies in ensuring that the [employer] make the proper reports of their income." *Id.*

*Coward*, 2011 U.S. Dist. LEXIS 74543, at *3-4.

60.     The case at bar is somewhat different from *Coward* inasmuch as Defendants actually underpaid Plaintiff and Class Members rather than merely misreporting his income. But this distinction has no bearing on the question of Article III standing, since it is still the case that "it is the reporting of income that triggers benefits, and losing benefits is an injury." *Id.* Plaintiff and Class Members lost benefits by virtue of how Defendants reported their income, and how Defendants reported employees' income was the direct outcome of the inaccuracies in employees' wage statements. That is why "Plaintiffs have standing to enforce the statutory reporting requirements" imposed by the WTPA. *Calderon v. Witvoet*, 999 F.2d 1101, 1106 (7th Cir. 1993).

61.     Whether or not Plaintiff and Class Members are presently eligible for social security benefits is legally immaterial. *See id.* ("Although only citizens and aliens residing in the

United States may receive benefits, 42 U.S.C. § 402(t), plaintiffs may eventually fulfill this requirement and therefore are entitled to keep their Social Security accounts accurate.").

62.    The *Calderon* court stressed that an employee's interest in ensuring that an employer properly report the employee's income is amplified by the difficulty of persuading the government to correct errors:

> The practical difficulty is that eligibility for Social Security benefits presumptively depends on reports that employers send to the government. A worker who seeks credit for unreported income bears the burden of proof, 42 U.S.C. § 405(c)(3), (4), which will be hard to carry if the employer has not furnished the customary documentation. The government believes employers who report earnings, because these reports are costly to make--they entail paying a substantial tax. The government tends not to believe undocumented claims by employees, because these claims are essentially costless yet could establish entitlement to large pensions or disability benefits.
>
> All of this means that the plaintiffs' real interest lies in ensuring that the Witvoets make the proper reports of their income.

*Id.*

63.    Here, the problem is not merely challenging but insurmountable. Plaintiff cannot even attempt to have his earnings report corrected because Defendants *did* report what they actually paid Plaintiff. The problem, rather, is that Plaintiff was underpaid. Yet the ultimate effect is the same—reduced social security eligibility. Because "[u]nder the Social Security statute, entitlement depends on 'the total of the wages paid . . . to an individual in a calendar year,'" Plaintiff and Class Members were irreversibly injured with respect to his social security benefits as soon as Defendants sent his W-2 to the IRS. *Coward*, 2011 U.S. Dist. LEXIS 74543, at *3 (N.D. Ill. July 8, 2011) (quoting 42 U.S.C. § 413(a)(2)(A)(ii)).

64.    Plaintiff retained Lee Litigation Group, PLLC to represent Plaintiff, FLSA Collective Plaintiffs and the Class, in this litigation and has agreed to pay the firm a reasonable fee for its services.

## STATEMENT OF CLAIM

### COUNT I

### VIOLATION OF THE FAIR LABOR STANDARDS ACT

65.     Plaintiff realleges and incorporates all the foregoing paragraphs of this Class and Collective Action Complaint as if fully set forth herein.

66.     At all relevant times, Defendants were and continue to be employers engaged in interstate commerce and/or the production of goods for commerce within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a). Further, Plaintiff and FLSA Collective Plaintiffs are covered individuals within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a).

67.     At all relevant times, Defendants employed Plaintiff and FLSA Collective Plaintiffs within the meaning of the FLSA.

68.     At all relevant times, each of the Corporate Defendants had gross annual revenues in excess of $500,000.

69.     At all relevant times, Defendants violated the FLSA because of their policy and practice of failing to pay Plaintiff and FLSA Collective Plaintiffs the full amount of wages, including overtime wages, due to improper deductions from their supposed salaries, which in accordance with the FLSA, invalidates the exempt classification.

70.     Records, if any, concerning the number of hours worked by Plaintiff and FLSA Collective Plaintiffs and the actual compensation paid to Plaintiff and FLSA Collective Plaintiffs should be in the possession and custody of Defendants. Plaintiff intends to obtain these records by appropriate discovery proceedings to be taken promptly in this case and, if necessary, will then seek leave of Court to amend this Complaint to set forth the precise amount due.

71.     Defendants knew of and/or showed a willful disregard for the provisions of the FLSA as evidenced by their failure to compensate Plaintiff and FLSA Collective Plaintiffs for all hours worked, including overtime hours, when Defendants knew or should have known such was due.

72.     Defendants failed to properly disclose or apprise Plaintiff and FLSA Collective Plaintiffs of their rights under the FLSA.

73.     As a direct and proximate result of Defendants' willful disregard of the FLSA, Plaintiff and FLSA Collective Plaintiffs are entitled to liquidated (i.e., double) damages pursuant to the FLSA.

74.     Due to the intentional, willful and unlawful acts of Defendants, Plaintiff and FLSA Collective Plaintiffs suffered damages in an amount not presently ascertainable of unpaid wages including unpaid overtime wages, due to improper deductions from their salaries, plus an equal amount as liquidated damages.

75.     Plaintiff and FLSA Collective Plaintiffs are entitled to an award of their reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 216(b).

## COUNT II

## VIOLATION OF THE NEW YORK LABOR LAW

76.     Plaintiff realleges and incorporates all the foregoing paragraphs of this Class and Collective Action Complaint as if fully set forth herein.

77.     At all relevant times, Plaintiff and Class Members were employed by Defendants within the meaning of the NYLL §§ 2 and 651.

78.     Defendants knowingly and willfully failed to pay Plaintiff and Class Members the full amount of regular and overtime wages as a result of improper deductions from Plaintiff's and Class Members' supposed salary in violation of the NYLL.

79.     Defendants knowingly and willfully failed to provide Plaintiff and Class Members with proper wage statements as required under the NYLL.

80.     Defendants knowingly and willfully failed to provide Plaintiff and Class Members with proper wage and hour notices as required under the NYLL.

81.     Due to the Defendants' NYLL violations, Plaintiff and Class Members are entitled to recover from Defendants unpaid wages, including overtime, due to improper deductions, reasonable attorneys' fees, liquidated damages, statutory penalties and costs and disbursements of the action, pursuant to the NYLL.

**COUNT III**

**BREACH OF CONTRACT**
**or in the alternative,**
**VIOLATION OF THE NYLL §§ 190 (1) and 196 (B)**
**(brought individually by Plaintiff)**

82.     Plaintiff realleges and reavers all the foregoing paragraphs of this Class and Collective Action Complaint as if fully set forth herein.

83.     Defendants maintained a policy regarding paid leaves wherein all employees are paid their accrued and unused paid leaves upon termination of their employment. Consequently, Plaintiff was entitled to receive the cash value of his outstanding paid leaves upon his final check.

84.     Defendants improperly deducted Plaintiff's accrued PTO from his supposed salary even though Plaintiff worked during such times. These improperly deducted paid leaves are actually unused PTO which Defendants owed Plaintiff upon his termination.

85.    Defendants' failure to compensate employees PTO in accordance with their implied and written policies is a clear breach of contract creating a cognizable private cause of action accepted by New York courts.

86.    Defendants' written and/or implied paid time off policies required the disbursement of earned PTO to departing employees and/or was silent on the issue.

87.    Defendants failed to provide PTO to Plaintiff upon his departure from Defendants' employment.

88.    Plaintiff has at all times performed all conditions, covenants, and promises required with his explicit and/or implicit employment terms and has never been in breach of the same.

89.    By failing to compensate the PTO, Defendants failed to provide full earned compensation to Plaintiff and in breach of the terms of his employment.

90.    The elements for a cause of action for breach of contract are: (1) formation of a contract between the parties; (2) performance by one party; (3) failure to perform by another party; and (4) resulting damage.

91.    At the time when Plaintiff's employment was terminated, Plaintiffs had accrued over hours of uncompensated PTO.  Upon his termination, Defendants failed to provide all owed compensation, including his compensation from his earned PTO which was improperly deducted from his supposed salary.

92.    At no point of during the employment with Defendants, was Plaintiff explicitly informed that he would lose accrued PTO benefits when their employment with Defendants terminated.

93.     As a result of said breach, Defendants owed Plaintiff money damages for Defendants' failure to compensate Plaintiff all his accrued and unused PTOs upon Plaintiff's termination.

94.     This failure is actionable not only as a breach of contract but also under NYLL. NYLL 190(1) provides that "[t]he term 'wages' also includes benefits or wage supplements as defined in section one hundred ninety-eight-c of this article, except for the purposes of sections one hundred ninety-one and one hundred ninety-two of this article."

95.     NYLL 198-c(2) defines wages as including "vacation, separation or holiday pay."

96.     Accordingly, the unpaid PTO owed to Plaintiff qualifies as unpaid wages under NYLL § 190(1), and Plaintiff can seek the appropriate relief under NYLL § 663.

97.     Moreover, Defendants also violated NYLL §196-B as "employers with one hundred or more employees in any calendar year, each employee shall be provided with up to fifty-six hours of paid sick leave each calendar year." NY Lab. Law § 196-B(1)(b).

98.     While former employees are not always entitled to recover unused PTO as wages, they may do so when there is an agreement to this effect with the former employer:

> The determination as to whether a former employee is entitled to be paid for accrued vacation time is governed by the contract between the parties (see Gennes v Yellow Book of NY, Inc., 23 AD3d 520, 521-522, 806 N.Y.S.2d 646 [2005]; Matter of Glenville Gage Co. v Industrial Bd. of Appeals of State of NY, Dept. of Labor, 70 AD2d 283, 421 N.Y.S.2d 408 [1979]; Bucalo v King O'Rourke Buick Pontiac GMC, 33 Misc 3d 136[A], 939 N.Y.S.2d 739, 2011 NY Slip Op 52031[U] ([App Term, 9th & 10th Jud Dists 2011]). A former employee may also be entitled to recover if she can establish that she reasonably relied on express verbal assurances that she would be paid for unused vacation time (see Garrigan v Incorporated Vil. of Malverne, 12 AD3d 400, 401, 786 N.Y.S.2d 525 [2004]; Gendalia v Gioffre, 191 AD2d 476, 594 N.Y.S.2d 322 [1993]), or if she can establish that the defendant employer had a regular practice of paying its employees upon their termination for accumulated and unused vacation time and that the employee relied upon such practice in accepting or continuing her employment [***5] for the defendant (see Spencer v Christ Church Day Care Ctr., 280 AD2d 817, 817-818, 720 N.Y.S.2d 633 [2001]). The plaintiff bears the burden of proving

an entitlement to receive payment in lieu of accrued vacation time (see Grisetti v Super Value, 189 Misc 2d 800, 801, 736 N.Y.S.2d 835 [App Term, 9th & 10th Jud Dists 2001]).

*Steinmetz v Attentive Care, Inc.*, 39 Misc. 3d 148(A), 148A (2d Dep't 2013)

99.     Plaintiff brings his PTO claims under a breach of contract theory or, in the alternative, the states' respective wage statutes. Plaintiff does not seek to recover damages under both these statutes and breach of contract.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself, FLSA Collective Plaintiffs and Class Members, respectfully request that this Court grant the following relief:

a.  A declaratory judgment that the practices complained of herein are unlawful under the FLSA and the NYLL;

b.  An injunction against Defendants and its officers, agents, successors, employees, representatives and any and all persons acting in concert with them as provided by law, from engaging in each of the unlawful practices, policies and patterns set forth herein;

c.  An award of unpaid wages, including overtime, due to improper deductions from salary misclassification under the FLSA and NYLL;

d.  An award of liquidated damages as a result of Defendants' willful failure to pay wages pursuant to the FLSA;

e.  An award of liquidated damages as a result of Defendants' willful failure to pay wages, pursuant to the NYLL;

f.  An award for compensation proportionate to the PTOs Plaintiff accrued during his employment with Defendants;

g.  An award of pre-judgment and post-judgment interests, costs and expenses of this action together with reasonable attorneys' and expert fees and statutory penalties;

h.  Designation of Plaintiff as the Representative of the FLSA Collective Plaintiffs;

i.  Designation of this action as a class action pursuant to F.R.C.P. 23;

j.  Designation of Plaintiff as Representative of the Class; and

k.  Such other relief as this Court deems just and proper.

## **JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable as of right by jury.

Dated: February 13, 2024

Respectfully submitted,

LEE LITIGATION GROUP, PLLC

By:  */s/ C.K. Lee*

C.K. Lee, Esq. (CL 4086)
Anne Seelig, Esq. (AS 1976)
148 West 24th Street, Eighth Floor
New York, NY 10011
Tel.: (212) 465-1188
Fax: (212) 465-1181

*Attorneys for Plaintiff, FLSA Collective Plaintiffs, and the Class*